William P. BURRELL and Billie Joe Burrell, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

ENGINE REBUILDERS, INC., Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 9822, 9823.

United States Court of Appeals
Tenth Circuit.

Sept. 26, 1968.

Gene F. Reardon, Denver, Colo., for petitioners.

Marian Halley, Atty., Dept. of Justice (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and Elmer J. Kelsey, Attys., Dept. of Justice, on the brief), for respondent.

Before MURRAH, Chief Judge, and PHILLIPS and HILL, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

These cases are here on petitions to review decisions of the Tax Court. In No. 9822, the Tax Court sustained a deficiency determined by the Commissioner of Internal Revenue in income taxes of the Burrells[1] for the year 1962. In No. 9823, the Tax Court sustained deficiencies determined by the Commissioner of Internal Revenue in income taxes of Engine Rebuilders, Inc.,[2] for its fiscal years ended October 31, 1963 and 1964,

---

1. Hereinafter called the Burrells.

2. Hereinafter called the Corporation.

respectively. For reasons which will hereinafter appear, the cases were consolidated for hearing in the Tax Court and in this court.

Both taxpayers used the accrual method of accounting and reporting income for federal income tax purposes.

In 1962, William P. Burrell,[3] as a sole proprietor, was engaged in reboring automobile engine blocks, called "cores," using them to rebuild automobile engines which he sold to both retail and wholesale customers. In order to maintain an inventory of cores to be rebored, Burrell desired that each customer to whom he sold a rebuilt engine with a rebored core therein, deliver to him the old core in the automobile engine which the rebuilt engine replaced, or a like old core from an automobile engine of the same make.

The amount of the bill which Burrell rendered to customers who purchased from him rebuilt engines with rebored cores was for a single amount, which, in fact, was made up of two items. Such items were reflected separately on an invoice furnished to the customer. Item One on such invoice was for the rebuilt engine. Item Two was for the core from the old engine, or a substitute therefor, to be delivered to Burrell by the customer.

The invoice carried the following statement:

"All * * * cores must be returned within 15 days or 8% federal excise tax will be deducted from your credit on core. After 45 days, consider them sold."

When a new core was returned, Item Two was cancelled, although the actual value of the old core did not equal the amount of the Item Two charge. Such charge was purposely made higher than the value of the old core to be returned, in order to induce customers to return old cores and to enable Burrell to maintain a needed inventory of old cores. Burrell did not strictly enforce the 45-day limit, but accepted old cores tendered to him for credit by customers a considerable time after the 45-day period had expired.

The effect of a transaction between Burrell and a customer was a charge against the customer in one amount, reflected on the bill delivered to him, made up of two items, one being Item One, the charge for the rebuilt engine with a rebored core sold to the customer, payable in cash, and which most customers paid on receipt of the bill; and the other, Item Two, to be paid by the return of a like core to Burrell within 45 days, or if not returned within 45 days, to be paid in full, in cash. The reason Burrell did not strictly enforce the 45-day time limit was that he preferred old cores to cash.

Burrell carried on his books an account referred to as "Customer Core Deposits." It reflected the amounts of Item Two charges which customers would have to pay in cash if they failed to discharge them by the return of an old core. The total of that account, as shown on Burrell's books on October 31, 1962, was $10,899.27.

On November 1, 1962, the Corporation was organized under the laws of Colorado. On that date, the Corporation, which was wholly owned by the Burrells, took over the wholesale business of Burrell. The amount shown on the books of Burrell in the "Customer Core Deposits" account was transferred to the Corporation. The Corporation added to such account $12,212 in its first fiscal year and $8,818.50 in its second fiscal year. The Corporation continued to use the same billing and invoice procedures; the same "Customer Core Deposits" account, and generally the same bookkeeping methods that the Burrells had followed.

The Burrells and the Corporation introduced evidence before the Tax Court that they neglected to reduce the amount shown in the "Customer Core Deposits" account by the amount of the cash charge in Item Two when the customers returned old cores to cancel Item Two, which left

---

3. Hereinafter referred to as Burrell.

the "Customer Core Deposits" account greatly inflated, but they wholly failed to show the amount of such claimed inflation or even an approximate amount of such inflation. They also failed to prove that they reported as income either any of the charges made against customers and reflected in Item Two of the invoices for the customers' obligation to return old reboreable cores or any amounts representing the value of old cores returned.

Burrell testified that if a customer did not deliver a core to take the place of the core sold to him, both he and the Corporation expected the customer to pay the Item Two charge in cash.

On and prior to July 7, 1962, a dispute existed between Burrell and the Internal Revenue Service, with respect to the amount Burrell owed for manufacturers' excise taxes for the period February 1, 1950, to October 31, 1952, a period in which Burrell was engaged in business other than reboring blocks and selling rebuilt engines. On July 7, 1962, Burrell and the Internal Revenue Service executed a compromise agreement, under which the Internal Revenue Service agreed to accept an amount offered on July 5, 1962, by Burrell in compromise of such excise tax claim. It recited certain stated considerations for its agreement to accept the offer, among which was an agreement by Burrell that "for the purpose of *computing income taxes * * * for the year 1962,* the inventory as of January 1, 1962 shall be $250.00." (Emphasis supplied.)

The person who prepared the joint return of the Burrells for income taxes for 1962 was not advised by the Burrells of the agreement as to the amount of the January 1, 1962 inventory, and he showed a January 1, 1962 inventory of $9,250.

The Commissioner, in determining the deficiency against the Burrells, added $10,899.27, shown in the "Customer Core Deposits" account, to their reported income for 1962, and in determining the deficiencies against the Corporation, added $12,212 to the reported income of

the Corporation for 1963, representing the balance in the "Customer Core Deposits" account as of October 31, 1963, less the $10,899.27 added to the Burrells' income for 1962, and added $8,818.50 to its reported income for 1964, representing the addition to such account during fiscal 1964. The Commissioner, pursuant to the provisions of 26 U.S.C.A. § 6653(a), also added a five per cent penalty against the Burrells, or $295.60, to the amount of the deficiency determined against them, for negligence in not reporting the amount of the opening inventory as $250.

The Burrells claim that if the beginning inventory for 1962 had been reduced to $250, then under proper accounting practices it would have been offset by a charge of $9,000 to the cost of goods sold. They therefore assert that there would not have been any change in the cost of goods sold or in their income for 1962 if their opening inventory for 1962 had been $250. But the agreement by the Burrells to use an opening inventory of $250 for the purpose of computing their income taxes for the year 1962 was a part of the consideration moving to the United States for the acceptance of the offer. If it were offset by $9,000 charged to cost of goods sold, no benefit from the agreement to use an opening inventory of $250 would have inured to the United States. The provision would have been a "mere exercise in futility." There was no suggestion of fraud, mistake, or overreaching. Accordingly, we hold the Commissioner was right in giving effect to the agreement to reduce the opening inventory to $250;[4] that the finding of carelessness on the part of the Burrells was fully justified, and the assessment of a penalty therefor was proper.

It is well settled that a taxpayer using the accrual method of accounting must accrue on his records an item of gross income when the "right to receive" it becomes fixed, even if actual receipt

4. Cf. United States v. Lane, 5 Cir., 303 F.2d 1, 4.

is postponed, and must so report it in his income tax return.[5]

■ An accrual basis taxpayer cannot defer an accrual of income merely because he chooses to defer actual receipt of payment.[6]

Under § 446(b) of the Internal Revenue Code of 1954, if a taxpayer's method of accounting does not clearly reflect income, "the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income."

Counsel for the United States assert that a definite sum was due the taxpayers upon the sale of each rebuilt engine, and that only by accruing the entire sales price reflected on the bill issued to the customer when the sale was made and subsequently taking a deduction for any credit given for the delivery by the customer of a reboreable engine block could the taxpayers clearly and accurately reflect their income. The contention finds some support in analogous situations in the returnable container cases. In such cases, where the containers are sold to customers and the vendor does not retain title to the containers, it is held that the sales prices of the containers, even if called a deposit, should be included in income as part of sales, with subsequent refunds being charged to expenses.[7]

Here, there can be no doubt that the title to the rebuilt engine with the rebored core passed to the purchasing customer at the time of the delivery of the same. And there can be no doubt that Item One on the invoices accrued on the date of the sale to the customer. As to Item Two, there might be some basis for the contention that the amount thereof did not accrue until the expiration of 45 days from the date of the sale and unless the customer during such period failed to return the replacement core, and that the value of the core returned should be accrued on the date of its return within the 45-day period. The taxpayers should at least have accrued the Item Two charge at the end of the 45-day period, if no reboreable core was returned by the customer within that period. And that, even though they delayed the collection of the Item Two charge, and accepted cores returned by customers after the 45-day period had expired, in satisfaction of Item Two charges. In such cases, the taxpayers should have entered a charge for the difference between the value of the returned core and the Item Two charge, and claimed the amount of such charge as a deduction in their income tax returns. But, the taxpayers' books were so lacking in completeness, that it would have been impossible to determine the amount the taxpayers should have accrued on that basis. Even at the hearing before the Tax Court, the taxpayers offered no proof by which the Tax Court could have determined the amount of the taxpayers' deficiencies on that basis.

Judge Murdock of the Tax Court, who tried the case, said:

"* * * The petitioners have not proven that they reported as income any of the charges they made against customers for the delivery of an old reboreable core or any amount as the value of an old reboreable core which was delivered against such a charge. * * * There is testimony that no income was reported from these sources. * * * *"

■ On the basis of the books of the taxpayers available to the Commissioner or his delegate and the evidence before the Tax Court, there is no way to determine the amount of the deficiencies, other than the method employed by the Commissioner.

The taxpayers contend that at the time of the sale the customer only pays for the rebuilt engine, that is, the Item One

5. Spring City Foundry Co. v. Commissioner of Internal Revenue, 292 U.S. 182, 184–185, 54 S.Ct. 644, 78 L.Ed. 1200.

6. 2 Mertens, Law of Federal Income Taxation (Rev.) § 12.60.

7. Okonite v. Commissioner, 4 T.C. 618, 628; LaSalle Cement Co. v. Commissioner of Internal Revenue, 7 Cir., 59 F.2d 361, 362, 363.

charge; and that there is no obligation on the part of the customer to pay the Item Two charge unless he fails to return a reboreable core, and that only on the happening of such contingency does the amount of Item Two become due and accrued; and that their customers nearly always brought in an old core to satisfy the Item Two charge. It should be noted that in making such contention, the taxpayers give no consideration to the accruing of the value of the reboreable cores returned and accepted by the taxpayers in satisfaction of the Item Two charge.

For the reasons indicated above, we disagree with the above-stated contention of the taxpayers. Moreover, neither the utterly inadequate books and records kept by the taxpayers nor the evidence before the Tax Court afforded any basis for the application of the theory advanced by the taxpayers with respect to when Item Two accrued.

The taxpayers' situation may be unfortunate, but if so, it is due entirely to their failure to keep adequate books and records.

We conclude the decision of the Tax Court was correct in both cases and it is affirmed.